Victor BONO et al., Plaintiffs-Appellants,

v.

William SAXBE, Individually and in his capacity as Attorney General of the United States et al., Defendants-Appellees.

No. 79–1327.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1980.

Decided April 14, 1980.

Dennis Cunningham, Chicago, Ill., for plaintiffs-appellants.

T. George Gilinsky, Senior App. Counsel, Crim. Div. Dept. of Justice, Washington, D. C., for defendants-appellees.

Before CUMMINGS, WOOD, and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs-appellants brought this class action as representatives of all present and future inmates of the Marion Penitentiary who are or who may be confined in that institution's "Control Unit." Appellants contend that both the conditions of confinement in the Control Unit and the manner in which prison officials decide to place inmates in the Control Unit are unconstitutional. The district court ordered some changes in the conditions and in the decision-making process, which appellants claim are insufficient.[1] We affirm with respect to most of the matters treated in the district court's two opinions but remand for further proceedings involving two matters as set forth herein.

Marion is a maximum security prison, and it is one of a small number of federal prisons which contain a Control Unit, in which prisoners with demonstrably proven behavior problems may be confined in order to keep them out of the general prison population. Prisoners may be placed in the Marion Control Unit directly from the federal courts, from the general population at Marion or from other federal and state prisons.

### 1. *Cruel and Unusual Punishment—Substantive Due Process*

The Control Unit at Marion consists of seventy-two single person cells and is one of nine units in which inmates are housed. Prisoners are placed in the Control Unit ostensibly for "administrative segregation," *i. e.*, for confinement of prisoners who would present a significant danger to the safety of other prisoners or staff or who would disrupt the orderly functioning of the prison if they were left in the general population. Confinement in the Control Unit is not intended to be for the purpose of punishment of prisoners, although the district court noted that it had been used punitively on a few occasions.

Appellants claim (1) that the *decision* to confine an inmate in the Control Unit is a decision to impose cruel and unusual punishment because prisoners were thereby *punished* in the absence of an alleged and proven offense and (2) that specific conditions in the Control Unit are so harsh as to constitute cruel and unusual punishment. (This second argument is treated in section 2, *infra*.) In response to argument (1), the district court stressed that the decision in question involved confinement for administrative reasons, not as a means of punishing defendants. Appellants argue that confinement in the Control Unit is "punitive in essence and effect" and that even if the *purpose* were administrative, not punitive, the protections of the Eighth Amendment would still apply. We agree that the Eighth Amendment protects the inmates from undergoing cruel and unusual punishment without regard to whether such punishment is imposed for punitive or administrative reasons. But this principle does not prevent defendants from deciding to change the conditions of confinement for administrative reasons, so long as the conditions do not involve cruel and unusual punishment. *See Hutto v. Finney,* 437 U.S. 678, 686–687, 98 S.Ct. 2565, 57 L.Ed.2d 522

---

1. The district court's decisions, including a more detailed statement of the facts, are reported at 450 F.Supp. 934 (E.D.Ill.1978) and 462 F.Supp. 146 (E.D.Ill.1978).

(1978) and *Kelly v. Brewer*, 525 F.2d 394, 399–400 (8th Cir. 1975).

■ The district court correctly held that if inmates were put in the Control Unit as a punishment for an offense or for no reason at all, they would have to be released because such treatment would be a violation of substantive due process. The court ordered defendants to conduct hearings, complete with the procedural safeguards discussed in section 4, *infra*, to determine if each inmate in the Control Unit was there for the purported administrative purpose—to remove those with demonstrable behavior problems from the general prison population. If any prisoners were in the Control Unit for other reasons (which would include being confined there as a punishment), or for no reason at all, the district court ordered that they be released.

■ We find no error in the district court's decision to require the defendants to review the reasons why each inmate was put in the Control Unit. Prisoners may, if necessary, seek judicial review of defendants' decision to confine them in the Control Unit by filing suit in the district court, and, if the procedures for confinement prescribed by the district court have not been followed or valid reasons for segregation have not been found, the district court will order their return to the general prison population.

■ If these procedures have been followed and prisoners are found to have been confined to the Control Unit for valid and administrative reasons, placing prisoners in the Control Unit does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment because the prisoners are not being "punished" for an offense (other than the one for which they have been convicted). It is in this context that we affirm the district court's finding

2. Appellants' Brief, p. 14.

3. In *Nadeau v. Helgemoe*, 561 F.2d 411 (1st Cir. 1977), the circuit court of appeals rejected the district court's application of the "legitimate penological objectives" test, noting that "at the present stage of development of the law relat-

that, when the Control Unit is used as a preventive measure, the *decision* to place a prisoner there is not a violation of substantive due process or of the Eighth Amendment.

2. *Cruel and Unusual Punishment—Specific Conditions*

■ As mentioned above, however, conditions of imprisonment may in fact be cruel and unusual punishment even though such conditions are imposed for administrative reasons. The Supreme Court has stated that the constitutional proscription of cruel and unusual punishment imposes three different kinds of limitations upon the treatment of prisoners. The cruel and unusual punishment provision (1) forbids the imposition of certain types of punishment, (2) proscribes punishment which is grossly disproportionate to the severity of the crime, and (3) imposes some limits on what may be made criminal and punished. *Ingraham v. Wright*, 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977). Appellants contend, citing the first two categories above, that the conditions in the Control Unit constitute cruel and unusual punishment because these conditions are in and of themselves impermissible types of punishment and because these conditions constitute punishment which is not in proportion to the severity of the relevant offense. Appellants also claim that the conditions in the Control Unit are cruel and unusual punishment because they are not "premised upon, and limited to the purposes of legitimate penological principles or objectives."[2] While we question whether this third objection may be successfully derived from the existing case law,[3] we are not persuaded that the conditions in the Control Unit, as modified by the district court, are cruel and unusual punishment under any one of the three analyses suggested.

ing to prisoners, the test used by the district court is not required by the Constitution. No majority opinion of the Supreme Court has ever adopted it; and the language in dissents and concurrences provides little support for it." 561 F.2d at 415.

Prior to the district court's order, prisoners in the Control Unit were locked up for 23½ hours per day, sometimes in closed front cells called "boxcars." The district court held that these practices constituted cruel and unusual punishment, enjoined the nonconsensual use of boxcar cells and ordered the defendants to provide the inmates with at least seven hours of exercise per week either indoors or outdoors.

According to appellants' brief, each inmate in the Control Unit is confined to a cell measuring 78 by 96 inches (length and breadth) and 100 inches high and may not participate in group activities available to the general prison population.[4] Inmates are handcuffed upon leaving their cells (except for showering or recreation), and their access to the library is restricted. Personal property is limited and there are few opportunities to earn money. Prison officials exercise some discretion over what reading materials inmates may receive from outside the prison. "Contact" visits with family and friends are not permitted. Thus prisoners are separated from their visitors by a plexiglass partition and must communicate over telephones. Prisoners are "strip searched" before and after such visits.

Prisoners in the Control Unit find it difficult to communicate with each other because of a glass or metal partition placed three feet in front of most cells. Each cell is equipped with a 40 or 60 watt light bulb, and there is little natural light. Prison officials, not doctors, decide whether to transfer a mentally ill prisoner out of the Control Unit. Prison guards who work on the Control Unit are not specially trained. Inmates are not placed in the Control Unit for definite periods of time, although the district court ordered periodic review of the reasons for their continued confinement. Regular prison food is served to those in the Control Unit, although seconds are not available and the food is sometimes cold.

In analyzing these facts, it is important to note that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). In applying the Eighth Amendment to certain types of punishment, courts have generally forbidden "intentionally inflicted excessive or grossly severe punishment . . . or that conditions so harsh as to shock the general conscience . . . ." *La Batt v. Twomey,* 513 F.2d 641, 648 (7th Cir. 1975); *French v. Heyne,* 547 F.2d 994, 1002 (7th Cir. 1976). The "unnecessary and wanton infliction of pain" was disapproved in *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), as well as practices or conditions found to be "barbarous." *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 860 (4th Cir. 1975). The conditions at issue here, while undoubtedly severe, do not constitute cruel and unusual punishment as defined in these cases.

Several circuit courts of appeals have considered the segregation of prisoners in circumstances similar to those of the instant case and have declined to find a violation of the Eighth Amendment. *See Sweet, supra,* 529 F.2d 854, 860–866 and *Sostre v. McGinnis,* 442 F.2d 178 (2nd Cir. 1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) and 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). In these cases, as well as in the instant case, the segregated area was not overcrowded or unsanitary. Inmates had some reading materials and an opportunity to exercise. "Seconds" at meals were not available and food was occasionally cold, but it was the same food as that served to the general prison population. Appellants have not contended that access to medical care, bedding or heating was insufficient or that the nutritional value of the food was inadequate; such factors are frequently crucial to a finding of cruel and unusual punishment.

---

4. This description of the Control Unit is not challenged by defendants, so we assume it to be accurate.

Inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time, although the duration "is a factor to be considered, especially if the confinement is punitive." *Sweet, supra,* 529 F.2d 854, 861. Expert testimony that such segregation could cause psychological harm is not determinative. *Sostre, supra,* 442 F.2d 178, 190–193. Since the district court has ordered periodic review of the reasons why an inmate is held in the Control Unit, and the results of such a review may be appealed to the district court, we do not feel that the indefinite nature of the administrative segregation in this case constitutes cruel and unusual punishment.

Appellants claim that the conditions successfully challenged in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) "mirror the conditions of life in the Marion Control Unit in many respects," [5] but the only similarity which exists is the indefinite nature of the confinement in both cases. In *Hutto,* the Supreme Court upheld the district court's order which limited the time an inmate could be confined in "punitive isolation" to 30 days. In doing so, the Court specifically noted the "interdependence" of the conditions at the prison, the prior unheeded district court orders to remedy constitutional violations and the severity of those violations, and concluded that the district court "was justified in entering a comprehensive order to insure against the risk of inadequate compliance." 437 U.S. 678, 687–688, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522. The conditions challenged in *Hutto* were described by the Court as involving the placement of at least four prisoners in a cell measuring 8 feet by 10 feet which contained no furniture. Their food was "grue" which provided only 1000 calories per day. No precautions were taken to prevent the spread of infectious diseases, which had infected some of these prisoners. The district court offered the prison officials several opportunities to cor-

rect these conditions on their own and, when they did not do so, entered the order in question. 437 U.S. 678, 682–683, 98 S.Ct. 2565, 2572–2573, 57 L.Ed.2d 522.

The conditions at Marion and the conduct of defendants in the instant case do not "mirror" those in *Hutto,* and, therefore, we see no reason to limit the use of administrative segregation in the instant case to a fixed period of time since periodic review has already been required. Indeed, to do so would be to intrude upon the exercise of the defendant's lawful discretion in an impermissible way. *See Kelly v. Brewer,* 525 F.2d 394, 399–400 (8th Cir. 1975). Thus, the conditions in the Control Unit (as modified by the district court) do not involve the kinds of punishment which would violate the Eighth Amendment.

Similarly, we do not find a constitutional violation under the second analysis provided by the Supreme Court (involving proportionality) even though we agree that a punishment may be enjoined if it is so out of proportion to the offense that it constitutes cruel and unusual punishment. In the leading case of *Weems v. United States,* 217 U.S. 349, 366–367, 30 S.Ct. 544, 548–549, 54 L.Ed. 793 (1910), a sentence of 12 years at hard labor and the loss of many civil rights was imposed for the crime of falsifying a public document and was said to "amaze" those who "believe that it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." The use of denationalization as a punishment for desertion from the navy in time of war was also successfully challenged as cruel and unusual punishment under the Eighth Amendment in *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). This court has recognized in an earlier stage of this litigation that the proportionality principle may be applied to punishment within a prison for disciplinary offenses. *Adams v. Carlson,* 488 F.2d 619 (7th Cir. 1973).[6] But as we noted in that

---

5. Appellants' Brief, p. 20.

6. In *Adams v. Carlson,* inmates at Marion were segregated for indefinite terms as punishment for a work stoppage and other offenses. This

case, disproportionality "is partly a question of fact and wholly one of degree." 488 F.2d 619, 636. Appellants have not demonstrated that the conditions in the Control Unit, as it now exists, are so disproportionate to the seriousness of the offenses for which the inmates were convicted that they constitute cruel and unusual punishment.

We also hold that for purposes of the Eighth Amendment the practices which appellants challenge are not unrelated to valid penological objectives such as deterrence, rehabilitation and institutional security (although we do not adopt this test as necessarily based upon an appropriate interpretation of the Amendment). The inmates placed in the Control Unit pursuant to the standards and procedures mandated by the district court have been found to present a significant threat to the personal safety of guards and other prisoners and to the orderly operation of the prison. Thus, it is in the interests of institutional security to limit time out of cells, to use handcuffs when such prisoners are outside their cells and to restrict their access to facilities which are available to the general prison population. Some limits on the prisoners' First Amendment freedoms may also be imposed if reasonably related to these legitimate penological objectives,[7] and appellants do not claim that the restrictions imposed in the instant case are unrelated to such objectives.

While rehabilitation is a valid penological objective, this court has held that the failure to provide rehabilitation programs, without more, does not constitute cruel and unusual punishment. *French v. Heyne,* 547 F.2d 994, 1002 (7th Cir. 1976). In light of the increased risk of altercations which could result from augmented rehabilitation programs, the limitation of these programs may serve the objective of institutional security and is not cruel and unusual punishment. Similarly, the added safety of serving food to the Control Unit inmates while they remain in their cells serves a valid

objective. Appellants have not claimed that the food available is so insufficiently nutritious as to constitute cruel and unusual punishment. *Cunningham v. Jones,* 567 F.2d 653 (6th Cir. 1977).

Even if this standard (requiring reasonable relation to valid penological objectives) were applied to the facts of this case, prison officials must necessarily be allowed some discretion in deciding how to reach those goals. It is well within their discretion to decide not to provide any special training for guards at the Control Unit and not to give psychological testing to every inmate who is placed in the Control Unit. (*See Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir. 1977) which sets forth guidelines for providing psychological treatment for prisoners.)

Appellants also contend that the lighting in the Control Unit and the strip searches after non-contact visits are not sufficiently related to a legitimate penological objective and therefore constitute cruel and unusual punishment. While we are not necessarily persuaded that these two practices constitute cruel and unusual punishment, we have ordered the district court to consider them on remand in the context of due process (*see* section 3, *infra* ). We believe that the Due Process Clause will provide a better framework in which to analyze these and other problems than the Eighth Amendment.

### 3. *Substantive Due Process*

The district court held that the inmates had a limited liberty interest under the Due Process Clause because the defendants' rules gave rise to the expectation of their being able to remain in the general population unless they demonstrated their inability to adjust to the general prison

---

court ordered hearings which would comply with the requirements of due process before such discipline could be imposed, but refused to find a violation of the Eighth Amendment on a disproportionality theory.

7. *See Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

population.[8] To place inmates who have not demonstrated such an inability in the Control Unit would be a violation of substantive due process and was enjoined by the court. Since the inmates, however, had only a limited liberty interest in avoiding confinement in the Control Unit, the district court held that the proper standard for review of the defendants' actions in connection with the confinement of inmates to the Control Unit was that such actions and procedures have a rational basis.

 We agree with the district court that the inmates' liberty interest is a limited one and is not a fundamental interest of the sort, the abridgment of which could be justified only by a compelling state interest. Appellants argue that the prisoners at Marion have a fundamental interest in avoiding assignment to the Control Unit because there is a fundamental right to avoid arbitrary confinement by the government. This right according to appellants, is protected by the First, Fourth, Eighth and Ninth Amendments; according to this argument the government must show a compelling state interest to justify confining any citizen, including a prisoner.

While the man in the street may be entitled to such broad protection, it is not fully available to a convicted prisoner. The Supreme Court has recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Thus, in the instant case, the "lawfully incarcerated" prisoners have only a limited interest (for purposes of the Due Process Clause) in remaining in the general prison

population, and the government's actions need only have a rational basis; a compelling state interest need not be demonstrated.

 We find that there is a rational basis for maintaining and operating a Control Unit at Marion, as circumscribed in the particular respects spelled out by the district court.[9] Prison officials have an obligation to the prisoners and staff to keep them safe from harm by other prisoners, and administrative segregation of dangerous prisoners is a reasonable way to achieve this goal. *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975). Prison officials also have an obligation to society in general to keep prisons operating in an orderly manner, and segregation of those who disrupt these institutions is a reasonable way to meet this obligation. "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977).

Appellants also criticize the district court's failure to consider whether the conditions found in the Control Unit are reasonably related to the defendants' interest in preserving institutional security. We can understand the district court's reluctance to review these conditions because the Supreme Court has recently emphasized the importance of deference to the informed discretion of prison officials. *See Jones, supra*, and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, such deference has its limits. "[I]n the absence of substantial evidence in the rec-

---

8. The existence of such prison regulations and the extent of the change in conditions distinguishes this case from the situation in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2523, 49 L.Ed.2d 451 (1976), in which the Supreme Court held that prisoners had no liberty interest in remaining in any one prison, and therefore were not entitled to a hearing before they were transferred for administrative reasons from a minimum security prison to one having maximum security.

9. We accept the need for a Control Unit as a "totality." However, we think it is our duty, in an effective examination of the "totality," to review significant specific conditions involved in the operation of the Control Unit to determine whether they have a rational basis. *See Newman v. State of Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) and our discussion of specific conditions, *infra*.

ord to indicate that the officials have *exaggerated their response* to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. at 2806 [emphasis supplied]. Similar limitations on the general "hands-off" policy have been noted in *Jones, supra,* 433 U.S. at 128, 97 S.Ct. at 2539 and in *Newman v. State of Alabama,* 503 F.2d 1320, 1329 and 1332 (5th Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

■ There is substantial evidence in the record before us to make an inquiry into the conditions of confinement appropriate. Defendants "exaggerated their response" to the legitimate interest in institutional security, and the nature of their response led to the imposition of procedural safeguards by the district court and changes in some conditions which were found to constitute cruel and unusual punishment. These abuses occurred after defendants had already been involved in litigation in federal court as a result of similar practices in the context of punitive segregation. *Adams v. Carlson, supra.* We, therefore, remand these proceedings to the district court for a determination whether certain conditions imposed on inmates in the Control Unit are reasonably related to the interest which defendants cite as supporting their use of the Control Unit—*i. e.,* the need for institutional security.

We are particularly concerned with the strip searches of inmates before and after *non-contact* visits with family and friends. Guards handcuff the inmates before they leave the Control Unit and escort them to the visitation area. The inmates are separated from the visitors by plexiglass, and guards observe these visits.[10] We do not believe that the rationale announced in *Bell v. Wolfish, supra,* justifies these strip searches. Thus, the Supreme Court in *Wolfish* relied on the possibility of contraband being brought into the prison during *contact* visits to justify the use of strip searches. Those contact visits were not closely supervised by guards. *Wolfish* should not be extended to the facts of this case without a showing that there is some risk that contraband will be smuggled into Marion during non-contact, supervised visits, or that some other risk within the prison will be presented. Since defendants do not discuss the searches in their brief, we are not in a position to dispose of the issue and, therefore, the district court should consider it on remand.[11]

We are also concerned with the adequacy of lighting in the cells since reading is one of the few activities available to inmates in the Control Unit.[12] Defendants did not discuss the lighting in their brief. Their response at oral argument to questions about the rationale for poor lighting was that defendants had discretion to determine whether the use of more than one light bulb would give an inmate significantly more glass than a single bulb out of which to fashion a weapon. We question whether such a concern could justify cells which were so poorly lighted that prisoners could not read. On remand, the district court may, in applying the rational basis test to significant matters, take evidence on these and like topics.

We do not disagree with the dissenting view here that prison administrators know their own business better than do we judges. We would certainly hope and expect that the state of the administrators' relative expertise is as Judge Wood's opin-

10. Testimony concerning visitation procedures appears at pages 265–268, 398–399, 456, 493–512, 678 and 848 of the trial transcript. We assume the practices described in this testimony and in the district court's Findings of Fact (Numbers 40 through 47) have continued up to the present time.

11. There is some evidence that strip searches are not required in connection with inmates' contact visits with their counsel. (See the Findings of Fact of the district court, Numbers 40 and 41.) We do not understand these apparent discrepancies, and only a remand can clarify the matter, which seems to us important.

12. We do not agree with the apparent thrust of the separate opinion that nearly total darkness or some other extreme of lighting is a *sine qua non* of constitutional concern.

ion suggests. Such expertise in their own business is, in fact, found among persons of all walks of life, who happen to become parties to actions in federal court. But our lack of expertness does not preclude our attempting here and elsewhere to draw constitutional and other lines, where that seems necessary, or requiring the district courts to draw such lines. Judge Foreman has acted with commendable thoroughness in the matters before him, and we remand only as to the few questions where the record is unclear or, in the case of lights, dim.

■ Appellants also claim that one of the factors (involving "disruption"), which defendants may take into account in deciding to confine an inmate to the Control Unit, is overly broad and unconstitutionally vague and allows defendants to punish inmates for constitutionally protected behavior. This factor relates to "incidents involving a disruption of the orderly operation" of the prison. Defendants may base their confinement decisions upon this among other factors.

We reject appellants' argument because, as we have stated, judicial review of confinement proceedings is available, and one of the issues subject to review is whether confinement in the Control Unit is being used punitively. If it is, the prisoner must be returned to the general population because such a use of the Control Unit is a violation of substantive due process. The district court in the instant case ordered defendants to provide specific notice of such allegedly disruptive incidents (which may form the basis of confinement decisions), together with reasons why such incidents were considered disruptive. The sufficiency of these reasons is, of course, subject to judicial review. Since the district court will be able to construe the requirements of disruptive incident determinations as narrowly as is necessary to comply with constitutional standards, no significant problem of vagueness or overbreadth is presented. Given such safeguards, reliance on allegedly disruptive incidents is properly committed to the defendants' informed discretion, and

should not have a significant chilling effect on legitimate rights of prisoner complaint or protest or religious or political freedom.

### 4. *Procedural Due Process*

The procedural safeguards established by the district court are sufficient under the flexible standards set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). These cases set forth standards of procedural due process for prisoners involved in disciplinary procedures and revocation of parole. In general, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Morrissey, supra*, 408 U.S. at 481, 92 S.Ct. at 2600, citing *Cafeteria & Restaurant Workers Union v. Mc Elroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961).

The protections provided by the district court strike a reasonable balance between the defendants' need to have a secure, orderly institution and the Control Unit inmates' need for protection against unwarranted segregation. Appellants argue that the procedures mandated by the district court have been abused in practice. We feel that the safeguards are adequate in principle; any abuse of them may be challenged in the district court on review of the individual commitment proceedings.

More specifically, the Court in *Morrissey* required the following procedural safeguards in the context of a parole revocation: (1) written notice of claimed violations, (2) disclosure of evidence against the prisoner, (3) an opportunity to be heard in person and to present witnesses and documentary evidence, (4) an opportunity to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation), (5) a hearing before a "neutral and detached" person (who the Court specified could not be the parole officer but who

need not be a judge or a lawyer), and (6) a written statement by the fact finders as to the evidence relied on, the action taken, and the reasons for that action. 408 U.S. at 489, 92 S.Ct. at 2604. It has also, however, been noted that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. Mc Elroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), cited in *Wolff, supra,* 418 U.S. at 560, 94 S.Ct. at 2976–2977. The district court ordered the defendants to provide hearings complying with these standards when inmates are initially confined to the Control Unit as well as periodic review of the reasons for their continued confinement.

■ The procedures required by the district court fully comply with the Due Process Clause, as construed in the cases cited *supra.* Appellants would prefer a hearing officer who is not employed by the Bureau of Prisons, but this restriction would be inappropriate since the district court has described the qualifications of the hearing officer in such a way as to eliminate persons who lack significant correctional experience as well as those who might be biased because they have been involved in another disciplinary or administrative matter with the same inmate. Appellants also assert that inmates are being placed in the Control Unit on the basis of confidential information which cannot be disclosed. The hearing officer, however, must document his reasons for not calling witnesses or introducing documentary information, and must list the evidence on which his decision is based. Since this record may be reviewed by the district court, the procedure ordered does not admit of significant abuse by defendants. *See Hayes v. Walker*, 555 F.2d 625 (7th Cir. 1977), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320.

The orders of the district court are therefore affirmed in part and remanded in part for further proceedings in accordance with this opinion.

HARLINGTON WOOD, Jr., Circuit Judge, concurring in part and dissenting in part.

I fully concur with the careful analysis of the majority concluding that no cruel and unusual punishment has been demonstrated in any respect, but I see little justification for remand to consider separately as possible due process violations the wattage of the light bulbs in the cells or the strip searches required in connection with visitations.

The majority mentions the failure of the defendants to discuss in their brief either the search issue or the light bulb issue. I believe that to be because neither of those matters has heretofore been considered as separate constitutional issues by either party. Those complaints were only two of numerous other complaints or details alleged by plaintiffs which were claimed in their "totality" to add up to unconstitutional confinement in the Control Unit. The majority has in effect found that there is nothing unconstitutional in the totality of the circumstances, but that there may be something unconstitutional about particular aspects of the confinement. I am reluctant to try to fashion new constitutional issues for the parties on appeal, particularly since I view both of the matters to be lacking in any possibility of reaching constitutional dimension. Nevertheless, even assuming the majority's suggestion that the new issues it raises may reach that level, I have little doubt that the prison officials did not act improperly.

The newly-fashioned constitutional lighting issue appears to be nothing more than concern for the wattage of the light bulb in each cell. It is not disputed that 60-watt or 40-watt bulbs are provided. Perhaps some prisoners may prefer 100-watt bulbs, but I do not consider the mere difference in wattage to raise a constitutional question requiring judicial intervention. If, for example, plaintiffs had alleged the use of excessively bright and glaring light, or a blinking light, or one so weak that there was danger to a prisoner in trying to move about the cell, I, too, might see some merit in pursu-

ing the issue on a constitutional basis. However, no claims of that nature have been made. For that matter, the first suggestion that the wattage of the bulbs may be unconstitutional was raised not by the plaintiffs, but by this court at oral argument.

Plaintiffs do not contend that the strip searches are indiscriminate or done merely to harass inmates. Apparently, the strip searches in question occur only in connection with the exercise of a prisoner's occasional visitation with a family member. The partition in the visitation room between family and inmate is no guarantee against the inmate gaining possession of contraband during some part of the whole procedure. The inmate was placed in administrative segregation in the first place because it had already been determined that he presented a significant danger to the safety of himself, other prisoners, or the staff. The prisoners segregated on that basis after being culled from the other inmates of a maximum security penitentiary deserve special security attention. At the time of visitation the prisoner must leave the control unit area and move through the other areas of the penitentiary to a visitation room previously used from time to time by other inmates. Prison officials may well be concerned with what a devious prisoner may pick up or have surreptitiously slipped to him by another prisoner along the way to and from visitation.

Even plaintiffs' own expert witness testified that he knew that "deadly weapons exist in all prisons and I think it is an interesting question how one deals with that." He went on to explain that it had to be dealt with as a "serious real problem in prisons." Dr. Menninger, one of defendants' expert witnesses, illustrated the severe security problems that can develop with prisoners by relating an episode occurring in another penitentiary where a prisoner requested to be assigned to another section and while being transferred managed to break his handcuffs and stab an officer. Another of defendants' expert witnesses testified that contraband in a penitentiary is a major problem. Another of plaintiffs'

witnesses testified that at Marion before the Control Unit was so named but when a similar unit was in use, weapons and gun powder were found in the unit. Apart from that testimony already in this record it is common knowledge that even in an efficiently run penal institution periodic shakedowns produce surprising amounts of weapons, drugs and other contraband. The occasional strip search may be a source of embarrassment or discomfort to a prisoner in the Control Unit, but I believe the searches are without any possible constitutional significance in the interest of security.

Particularly in a case such as this where prisoners have not challenged conditions other than in their totality judicial review of those individual conditions is little more than the substitution of our judgment about prison administration for that of the prison officials charged with the day-to-day operations of the institutions.

Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Bell v. Wolfish*, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). Chief Judge Foreman devotes much of his time to

prison matters. Applying his knowledge and experience, including a personal inspection of the Control Unit, he has sorted through the plaintiffs' complaints and has remedied all that deserve a constitutional cure. The significance of the majority opinion is not the time that will be required by the court and prison officials to reconsider the light bulb and search issues. Instead, it appears that this court has *sua sponte* bestowed constitutional significance on the many minor details of prison administration. I would leave all those details to our prison administrators who are experienced and knowledgeable in their difficult profession. We are not. I do not believe a court should meddle in prison affairs unless legitimate constitutional issues are raised that require our intervention. *Id.* The two remaining matters, even if they had been properly raised, are not of that quality.

I would affirm on all issues and respectfully dissent only on the remand requirement.