Richard A. FRENCH, et al.,
Plaintiffs-Appellees,

v.

Norman G. OWENS, et al.,
Defendants-Appellants.

Richard A. FRENCH, et al.,
Plaintiffs-Appellees,

v.

Norman G. OWENS, et al.,
Defendants-Appellants,

United States of America,
Amicus Curiae.

Nos. 83–2280, 85–1065.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1985.

Decided Nov. 26, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 12, 1986.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellants.

Donald R. Lundberg, Leg. Services Organization of Ind., Indianapolis, Ind., for plaintiffs-appellees.

Before CUDAHY and ESCHBACH, Circuit Judges, and MORTON, Senior District Judge.*

CUDAHY, Circuit Judge.

This is an appeal from an order of the United States District Court for the Southern District of Indiana requiring extensive reforms at the Indiana Reformatory at Pendleton, Indiana. Defendants, officials of the Reformatory, allege on appeal that the court erred in finding constitutional violations and exceeded its authority in issuing a detailed injunction. We have reviewed the order and affirm most of its provisions. We vacate with respect to several provisions and remand to the district court for further consideration.

I.

Four prisoners at the Indiana Reformatory at Pendleton ("the Reformatory" or "Pendleton") filed a class action suit under 42 U.S.C. § 1983 on behalf of all persons who are or will be in the facility. The suit complained of overcrowding and of the prison's use of mechanical restraints. It protested poor medical care and food, inadequate recreation, discrimination against those in protective custody, insufficient safety personnel and noncompliance with fire and occupational safety standards. After a 16-day trial, the district judge, exercising his pendent jurisdiction, found that many of these conditions violated various provisions of Indiana law. He also found that the practice of double-celling, in concert with other overcrowded and unsanitary conditions, violated the eighth and fourteenth amendments of the United States Constitution. *French v. Owens*, 538 F.Supp. 910 (S.D.Ind.1982). Therefore, he issued a permanent injunction ordering detailed changes.

Defendants appealed. While the appeal was before this court, the Supreme Court decided *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), which held that under the eleventh amendment, federal courts lacked jurisdiction over claims for injunctive relief against state officials based upon state law. In light of *Pennhurst*, we remanded this case to the district court so it could consider whether the conditions that it had found violated state law also violated federal law.

On remand, the court found that most of the conditions which violated state law, offended the eighth amendment as well. It therefore issued an amended order. That order also accounted for improvements that had been made at the facility over the two-year period since conditions had originally been considered.

Defendants again appeal. The United States has filed an amicus brief stating its position in detail on the various alleged violations and on the remedies prescribed.

II.

"In analyzing a challenge to prison conditions based on the Eighth Amendment, a court should examine each challenged condition of confinement ... to determine whether that condition is compatible with the 'evolving standards of decency that mark the progress of a maturing society.' " *Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir.1981) (*quoting Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). We therefore examine the specifics of Judge Dillin's order to determine if there have been violations of the eighth amendment and, if so, whether the remedy is appropriate.[1]

A. Double-Celling

Built in 1923, by 1982 the Pendleton reformatory housed almost 2,000 prisoners, over twice its intended capacity. To accommodate the rise in population, prison offi-

---

* The Honorable L. Clure Morton, Senior District Judge of the Middle District of Tennessee, sitting by designation.

1. Judge Dillin offered an excellent and thorough description of conditions at Pendleton. *See*

*French v. Owens*, 538 F.Supp. 910 (S.D.Ind. 1982). We, therefore, need not rehash the facts of the case at length but instead touch on them only as they are important in explaining our result.

cials placed two prisoners in cells that were intended for one. More than one-third of all cells were converted to double cells. After reviewing the record and personally visiting the prison site, Judge Dillin concluded that "rampant" double celling, in conjunction with general conditions of overcrowding, violated the eighth and fourteenth amendments.[2]

By 1982, the gross available space per man in the double cells was 24 square feet, the net amount approximately half that. In the Administrative Segregation Unit—where prisoners are kept who need to be separated from the general inmate population—the ceilings are lower and inmates on the top bunks of double cells are unable to sit up. There is no space for a chair on the floor. As a result, some have developed back problems.

The district court found that the forty per cent of prisoners in double cells spend large amounts of time together, up to 20 to 23 hours per day for the several hundred prisoners in protective custody or without work assignments.

Deplorable conditions exist beyond the double-celling problem. All cells and dormitories are inadequately ventilated. There is no means of distributing heat to the cells and, in summertime, no system for circulating air to the cells. Rooms are dirty and odorous. Toilets and lavatories are "virtually uncleanable." Lighting is poor. Cells have no hot water.

Especially in light of the poor supervision, safety, medical care and food preparation at the facility, Judge Dillin found the conditions intolerable. He ordered that the population be reduced to 1,615 and enjoined double celling.

■ As the district court acknowledged, the mere practice of double celling is not *per se* unconstitutional. In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court upheld its use in some instances. The institution at issue in *Rhodes*, however, was de-

scribed as a "top-flight, first class facility." *Id.* at 341, 101 S.Ct. at 2396. It had been built in the 1970s. Prisoners there shared double cells of 63 square feet, one-third larger than the cells at Pendleton. Each cell contained a night stand and shelf and radio unit. All cells had hot water. Similarly, this court upheld the use of double celling at the State Prison at Pontiac, Illinois in *Smith v. Fairman*, 690 F.2d 122 (1982), *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). Pontiac's double cells ranged in size from 55 to 65 square feet, giving prisoners there 20 to 35 per cent more space than their Pendleton counterparts. Most of the cells at the Pontiac facility were "neat and clean" and much of the crowding in prisoners' cells was due to the inmates' books, records, stereos and electronic equipment. Food at Pontiac was found to be nutritious and wholesome. Violence had dramatically declined and medical care was found adequate.

While these institutions passed constitutional muster, the *Rhodes* court noted that prison conditions could be cruel and unusual when they "deprive inmates of the minimal civilized measure of life's necessities," 452 U.S. at 347, 101 S.Ct. at 2399, or when they result in punishments that " 'involve the unnecessary and wanton infliction of pain' or are grossly disproportionate to the severity of the crime." *Id.* at 346, 101 S.Ct. at 2399 (citations omitted).

■ In this circuit, we determine whether there have been "serious deprivations of basic human needs," *id.* at 347, 101 S.Ct. at 2399, by examining the "totality of conditions of confinement." *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981). In this light, the picture painted of Pendleton is very different from that seen in *Smith* or *Rhodes*, from the lack of space and furnishings, to the unwholesome food, medical neglect and continuous threats to prisoners' safety. We agree that such conditions constitute cruel and unusual punishment. *See Toussaint v. Yockey*, 722 F.2d

---

**2.** The eighth amendment is applicable to the state through the fourteenth amendment. *Rob-*

*inson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

1490, 1492 (9th Cir.1984) (injunction upheld against double celling where it "engender[s] violence, tension and psychological problems"); *Wellman v. Faulkner,* 715 F.2d 269 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984) (overcrowding can violate eighth amendment).

On appeal, defendants contend that even if the conditions were cruel and unusual, the district court's remedy was too broad. They assert that if the population is reduced, there should be no need to ban double celling.

At this time we disagree. The district court has broad powers to forge an adequate remedy to permanently correct any constitutional violation. As the Supreme Court has stated, "once a constitutional violation is demonstrated, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth is inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Here, where there was narrowly cramped double celling as a feature of severely overcrowded, unsafe and unsanitary conditions, we cannot conclude that the district court exceeded its broad remedial power. Under present conditions, a complete ban on double celling is fully justified. However, since double celling is not *per se* unconstitutional, if the Indiana prison system eliminates the severe overcrowding at Pendleton and the pernicious evils that accompany it, the state can at a later date seek some modification of the ban on double celling. If adequate reasons were shown and overall conditions warrant, such a request would, of course, be entitled to consideration.

### B. Mechanical Restraints

Plaintiffs also complained that the use of mechanical restraints at Pendleton was unconstitutional. Mechanical restraint was employed against those who threatened suicide or were physically disruptive. Between January 1980 and January 1982, mechanical restraint was used 84 times. Prisoners were often chained for between 12 and 24 hours, with instances recorded of up to 2½ days. Those restrained were usually chained spread-eagled to their bed, their limbs secured by hard shackles. Often they were stripped. Sometimes the mattress was removed from the bed frame. These prisoners were frequently denied the right to use the toilet and had to lie in their own filth. At least one prisoner suffered permanent nerve damage to his wrists from lying in shackles.

Appalled by this catalogue of inhumanities, the district court issued broad and detailed restrictions on the further use of hard shackles and ordered that mechanical restraint not be used as a form of punishment. It confined the use of restraint to the infirmary and allowed its use only when the superintendent of the prison or his substitute approved. The court required psychiatric approval for the use of restraint. The institution can restrain prisoners only for two hours before receiving the approval of a psychiatrist. During the period of restraint, trained medical personnel must constantly supervise the prisoner. Every 12 hours a psychiatrist must review the need for further restraint. Those in need of restraint beyond 24 hours must be sent to a psychiatric hospital. Inmates must be released at least every four hours to use the toilet and must be kept in proper clothing.

Defendants object that the district court based its conclusion on insufficient findings of fact and determinations of law and that the court's lengthy order was without authority because it restrained "the effective management of dangerous and violent offenders." (Defendant's brief at 33). We disagree.

The court was clearly within its right to enjoin such "outmoded and inhuman" practices. *Landman v. Royster,* 333 F.Supp. 621, 648 (E.D.Va.1971). The image of individuals shackled naked for days to a metal bed frame is a sad reminder of the "soul chilling inhumanity of conditions in America's prisons." *Rhodes v. Chapman,* 452 U.S. 337, 354, 101 S.Ct. 2392, 2403, 69 L.Ed.2d 59 (1981). While some form of

temporary restraint may be necessary against those who pose a threat to themselves and others, Pendleton's methods are "too close to the rack and the screw to permit of constitutional differentiation." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Other courts have found such practices to be cruel and unusual punishment. *See Stewart v. Rhodes*, 473 F.Supp. 1185, 1790–93 (S.D. Ohio 1979), *appeal dismissed* 661 F.2d 934 (6th Cir.1981); *Owens-el v. Robinson*, 442 F.Supp. 1368 (*modified* 457 F.Supp. 984 (W.D.Pa.1978)).

In dealing with detailed instances of brutality, we cannot say the district court exceeded its broad remedial authority in issuing a detailed injunction, especially where Indiana's efforts to explore alternatives seem lacking. *See Landman v. Royster, supra*, 333 F.Supp. at 648. *Cf. Wells v. Franzen*, 777 F.2d 1258 (7th Cir.1985) (violation of due process to restrain prisoner without the approval of a health professional and the taking of adequate health precautions). With respect to some of its specifics, however, we encourage the court at a proper time and in response to specific requests to allow for more flexibility. For example, if a psychiatrist is not immediately available, such as during the middle of the night, perhaps another qualified physician might approve the initial restraint. On the whole, however, Judge Dillin's order prescribes the necessary initial steps for curbing an obnoxious practice. As experience is gained under a properly regulated regime, the district court may permit modifications which seem fully justified by the circumstances.

For example, the United States has urged that bed restraints be allowed elsewhere than in the infirmary. We think that the urgent need for proper control fully justifies the district court in restricting them to the infirmary at this time. But this restriction might prove unnecessary under some future conditions.

## C. Medical Care

As the population at Pendleton skyrocketed, the quality of medical care declined. The district court found the institution severely understaffed. Between 1978 and 1982, the population increased by 62 per cent but the number of physicians affiliated with the facility dropped, as did the number of mental health personnel. While there are over 190 requests for medical care per day, there is only one full-time physician, who speaks little English. Inmates in need of medical help get between one and ten minutes each for evaluation and treatment. As would be expected, there are numerous instances of neglect, misdiagnosis and maltreatment. One patient had tuberculosis that went undiagnosed, another had a broken back that went untreated, a third had an abscessed rectum that went unattended for six months.

"When a state imposes imprisonment as a punishment for a crime, it accepts the obligation to provide persons in its custody with a medical care system that meets minimal standards of adequacy." *Wellman v. Faulkner*, 715 F.2d 269, 271 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). The Supreme Court had ruled that the eighth amendment is violated by "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Such indifference may be evinced by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or by showing "systematic or gross deficiencies in staffing, facilities, equipment or procedures." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980) (citation omitted), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Wellman, supra*, 715 F.2d, at 272. Under either criterion, Pendleton's medical services fall short of accepted standards.

After finding an eighth amendment violation, Judge Dillin ordered a comprehensive overhaul of Pendleton's medical staff. He ordered the appointment of an additional

full-time physician, required that there be 5 physician's assistants, a hospital administrator, and a full-time pharmacist. To improve mental health services, Judge Dillin mandated that there be one psychiatrist, two psychiatric social workers, a clinical psychologist and two behavioral clinicians. He also required the appointment of 9 medical technicians and two typists and specified that all medical personnel must be able to speak English.

The United States as amicus objects that detailed medical reforms and other modifications ordered at the facility may not be necessary if population is reduced and argues that the state should have been allowed to submit a plan for reform. While we hesitate to tell the state of Indiana in painstaking detail how to staff the health departments of its prisons, Judge Dillin was within his power in drafting a detailed remedy to curb egregious neglect and mismanagement. Here, too, however, every element of the injunction need not be writ in stone. As the population declines and food, ventilation, sanitation and safety improve, the medical needs of the prisoners may change. To account for such changes, prison officials should be encouraged to report periodically to the district court to determine if modifications of the order are necessary. These reports should provide, *inter alia,* suitable indicia of the demand for services, the rate of utilization of services and the quality of services. Based on such reports, the district court may lower the manning requirements or even abrogate those requirements entirely if those steps would be consistent with a continuing guarantee of constitutional rights.

### D. Kitchen Facilities

As the Tenth Circuit noted in *Ramos v. Lamm, supra,* 639 F.2d at 570–71, "the state must provide an inmate with a 'healthy, habitable environment.' This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." The district court found the state in violation of these standards. The kitchen, commissary and food storage areas were unsanitary and infested with mice and roaches. The floor was found uncleanable due to holes, cracks, crevices, missing tile and gross porosity. Some of the ceiling was missing. Pots and pans were covered with uncleanable grime. Little attention was paid to special diets.

While conditions at the time of filing suit were grossly inadequate, the district court noted that the state allocated $2 million to rehabilitate the kitchen facility. The court therefore issued a general directive requiring that the kitchen be maintained to provide inmates with safe, sanitary and nutritious food. We approve fully of the district court's action.

### E. Exercise and Recreation

The district court ordered that prisoners be permitted to engage in at least 90 minutes per day of "meaningful recreation." In so ruling, we believe the court overstepped its bounds. The general population gets 90 minutes of outdoor exercise during good weather. The Pendleton facility has 2 baseball diamonds, handball, volleyball and basketball courts, a football field, a jogging area and a horseshoe pit. In inclement weather, the prisoners exercise indoors in the fieldhouse, which is equipped with sporting goods and a small gym and has a television set. Judge Dillin objected to the time spent in the indoor gym because it was cramped and noisy. He also objected to the treatment of those in Administrative Segregation. These individuals get 2½ hours of exercise twice a week and spend approximately one hour each week in commissary. The judge found that these prisoners receive insufficient daily exercise.

Lack of exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised. In *Preston v. Thompson,* 589 F.2d 300 (7th Cir.1978), for example, this court found a violation where prisoners were never allowed out of their cells to exercise. Similarly, in *Spain v.*

*Procunier,* 600 F.2d 189, 199 (9th Cir.1979), the court found it an eighth amendment violation to completely deny some prisoners exercise and to limit the remaining population to less than five hours indoor exercise per week.

■ However, we cannot say that the prisoners here are denied "the minimal civilized measure of life's necessities" merely because during some periods they cannot hear the television. Nor can we call it a "wanton and unnecessary infliction of pain" to have to exercise in cramped quarters. Even those within the Administrative Segregation Unit are allowed exercise periods within the constitutional minimum. *See Bono v. Saxbe,* 620 F.2d 609, 613 (7th Cir.1980).

### F. Protective Custody

Plaintiffs complained that those prisoners who were confined in protective custody did not have equal access to the same vocational, academic and rehabilitation programs as those in the general prison population. In its second opinion, the district court agreed with defendants that the failure to provide such programs did not constitute cruel and unusual punishment, *see French v. Owens,* Mem. No. IP–75–677–C (S.D.Ind. Dec. 14, 1984); *see also Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1982) (deprivations of jobs and educational programs "simply are not punishment"), *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir. 1981); *French v. Heyne,* 547 F.2d 994, 1002 (7th Cir.1976), but nonetheless ordered that the same programs must be provided to protective custody inmates as to others. It stated that "providing access to rehabilitative programs to general population inmates while denying access to such programs to inmates segregated for nondisciplinary reasons may constitute a violation of the Equal Protection Clause of the Fourteenth Amendment." *French v. Owens,* Mem. op. at 14. The court concluded that treating protective custody inmates differently did not serve any rational interest when the state created conditions necessitating the widespread use of protective custody.

■ We cannot accept the district court's rationale. This circuit has previously held that security reasons justify limiting the access of prisoners in protective custody to rehabilitative programs. *See Bono v. Saxbe, supra,* 620 F.2d at 615; *Cf. Lock v. Jenkins,* 641 F.2d 488, 494 (7th Cir.1981) ("Prisoners selecting placement in the [protective custody] unit, generally to avoid perceived dangers to themselves, also logically must be subject to significant restrictions."). Neither *Bono* nor *Lock* suggests that limitations on protective custody inmates do not apply when the state creates conditions that increase reliance on protective custody. In urging such an exception to this court's prior rulings, Judge Dillin has, we believe, undermined the state's ability to operate an effective protective custody program. Some argument can always be made that prison conditions have contributed to the violent tendencies that require one prisoner to be locked up to protect him from others and another to be locked up to protect others from him. As the court concluded in *Allgood v. Morris,* 724 F.2d 1098, 1100–01 (4th Cir.1984):

> The rationality of a distinction between privileges for prisoners in the general population and those in protective custody goes to the fundamental purpose of such segregation. Protective segregation is offered to inmates for their safety, the safety of others in confinement, and to insure institutional security and order. To allow prisoners in protective custody to enjoy all of the same privileges to the same degree as those in the general population would eviscerate the nature of protective segregation. Because the differences in treatment among prisoners in protective segregation and the general population has a substantial, rational basis in the legitimate state interest of prison security, we hold that Allgood's rights to equal protection have not been abridged.

Accordingly, we disapprove the court's order regarding protective custody. Of

course, this should not discourage the state from providing such rehabilitative programs as are feasible within the limitations of the protective custody program.

### G. Correction Officers

While some instances of violence unfortunately may be expected in America's prisons, the record in this case details countless examples of abhorrent beatings and wicked acts. As the district court found, "security of inmates from physical attacks by other inmates is a problem at the Reformatory. Severe forms of violence, including stabbings, bludgeonings, and homosexual rapes, occur with distressing frequency. A number of these instances have resulted in fatalities. Lesser forms of violence, such as harassment, threats, intimidation, striking and beating may be said to be routine." One prisoner was doused with lighter fluid by an inmate attempting to set him aflame. Another was bludgeoned with a 10 pound can opener. A 15 year old youth was raped at knifepoint by a group of inmates.

The constitution cannot countenance such widespread abuses. "The right to personal security constitutes an 'historic liberty interest' protected by the due process clause. *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). And that right is not extinguished by lawful confinement, even for penal purposes." *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). As this circuit has noted, the eighth amendment is violated when attacks occur so frequently as to be "pervasive," *Walsh v. Brewer*, 733 F.2d 473, 475 (7th Cir.1984). The district court so found and its order requiring the state to submit a plan to employ and train sufficient security personnel to ensure the inmates safety is without question reasonable and legitimate.

### H. Fire and Safety Violations

Plaintiffs, finally, complain that the Pendleton Reformatory does not meet the constitution's required standards for fire safety or for safety in work areas. The plaintiffs alleged that electrical wiring was not properly maintained, that there were inadequate fire exists, and that the facility had no established procedures to respond to fires. (Plaintiffs' Supplemental Brief at 33–37). They noted that paper articles were stored in boiler rooms and that solvents were stored near flames. The district court found numerous violations of the Indiana State Fire Regulations. It found these violations constitutionally unacceptable and ordered that "to secure compliance with the personal safety requirements of the eighth and fourteenth amendments, the defendants shall bring all buildings into compliance with the standards of the Indiana State Fire Marshal." *French v. Owens*, Amended Order No. IP 75–677–C, at 5 (S.D.Ind. Dec. 14, 1984).

Plaintiffs also charged that the work areas had improper ventilation, that prisoners were exposed to lethal fumes and fluids, that power tools lacked safety guards and that there was inadequate eye protection. The district court, using Federal OSHA standards as a guide, agreed that these conditions were constitutionally defective. It therefore ordered full compliance with OSHA regulations.

There is no question that fire and occupational safety are legitimate concerns under the eighth amendment. *Santana v. Collazo*, 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Leeds v. Watson*, 630 F.2d 674, 675 (9th Cir.1980). However, "not every deviation from ideally safe conditions constitutes a violation of the constitution." *Ruiz v. Estelle*, 679 F.2d 1115, 1152–53. *See Santana, supra*, 714 F.2d at 1183. The eighth amendment does not constitutionalize the Indiana Fire Code. Nor does it require complete compliance with the numerous OSHA regulations. "The district judge may consider these standards, but must order the correction of specific violations and may require only that these corrections bring the conditions above constitutional minima." *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982). While fire and occupational safety no doubt need

improvement at Pendleton, the district court erred in requiring compliance with specific administrative requirements to remedy those defects. On remand, the district court should reconsider these matters and require specific corrections of conditions to meet constitutional standards.

### III.

The judgment of the district court insofar as it pertains to overcrowding and double celling, mechanical restraints, medical care, kitchen services and correction officers is therefore affirmed. The judgment to the extent it pertains to exercise and recreation, protective custody and fire and occupational safety is vacated and remanded to the district court for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.