**Christopher SCARVER, Plaintiff,**

v.

**Jon LITSCHER, Gerald Berge, Peter Huibregtse, Jeff Hrudka, Vicki Sebastian, Linda Oatman, Brain Kool, Gary Blackbourn, Trina Kroening, Karla Stelpflug, Stephen M. Puckett, Waltz and Holden, Defendants.**

**No. 01C497C.**

United States District Court, W.D. Wisconsin.

May 27, 2005.

See, also, 2004 WL 2009246.

Allen A. Arntsen, Madison, WI, for Plaintiff.

James E. McCambridge, Assistant Attorney General Wisconsin Department of Justice, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief brought under 42 U.S.C. § 1983. Plaintiff Christopher Scarver, a Wisconsin state inmate who suffers from severe mental illness, alleges that defendants subjected him to conditions of extreme sensory deprivation and social isolation despite his severe mental illness and were deliberately indifferent to his serious mental health care needs. Plaintiff filed his original complaint in August 2001. Since that time, the action has been stayed twice pending resolution of the related case, *Jones' El v. Berge*, 00–C–421–C.

On July 28, 2004, the Court of Appeals for the Seventh Circuit decided the last of the issues raised on appeal in *Jones' El*. Shortly thereafter, plaintiff moved to reopen this case so that he could continue to litigate his claim for money damages. Because neither this court nor the court of appeals had decided whether defendants violated plaintiff's Eighth Amendment rights, I granted plaintiff's motion in an order dated September 1, 2004. Jurisdiction is present. 28 U.S.C. § 1332.

Now before the court is defendants' motion for summary judgment in which they argue that (1) plaintiff's claim is barred under the doctrines of claim and issue preclusion; (2) 42 U.S.C. § 1997e(e) bars plaintiff from recovering monetary damages; (3) plaintiff's claim fails on the merits; and (4) defendants are entitled to qualified immunity. I conclude that the doctrines of claim and issue preclusion do not bar plaintiff's claims; the *Jones' El* class was certified with respect to injunctive relief only and plaintiff's claim is for monetary damages. 42 U.S.C. § 1997e(e) does not bar plaintiff's claim; he suffered physical injury related to his mental suffering and he seeks punitive damages in addition to compensatory damages.

However, plaintiff cannot prevail on his claim that defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious mental health care. The undisputed facts reveal that plaintiff received extensive mental health care while he was incarcerated at the Wisconsin Secure Program Facility. That it may not have been all that he wanted it to be does not make it constitutionally inadequate. Plaintiff is not entitled to the treatment of his choosing.

Plaintiff's claim that he was subject to inhumane conditions of confinement is more compelling. The record evidence shows that while he was incarcerated at the Wisconsin Secure Program Facility, he was subjected to extreme social isolation and sensory deprivation. In addition, the evidence reflects a marked increase in the frequency and severity of plaintiff's acts of self-injury. Defendants' suggestion that plaintiff had to be placed in such restrictive conditions for security reasons is plausible but not conclusive. During the five years preceding plaintiff's transfer to the Wisconsin Secure Program Facility, he had been incarcerated without serious incident in a federal facility in Colorado where he had not been subject to such severe conditions; there is no suggestion that the federal facility did not provide adequate security. Nonetheless, defendants are entitled to qualified immunity for money damages because it was not clearly established at the time that subjecting mentally ill inmates to sensory deprivation and social isolation would violate the Eighth Amendment. Because plaintiff seeks monetary damages only, this finding that defendants are entitled to qualified immunity means that they are entitled to summary judgment also.

From the parties' proposed findings of fact, I find that the following are material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties'*

Plaintiff Christopher Scarver is a Wisconsin state inmate who suffers from mental illness. Between April 2000 and August 2003, he was incarcerated at the Wisconsin Secure Program Facility in Boscobel, Wisconsin. During the time, defendant Gerald Berge was the warden and oversaw all facility operations, including the provision of psychological services. Pursuant to this duty, defendant Berge participated in daily and weekly meetings to discuss inmate problems, behaviors and medical needs. Defendant Peter Huibregtse has been the deputy warden at the Boscobel facility since April 2000. As deputy warden, he supervised the facility's psychologists and was responsible for reviewing treatment programs with the unit managers, the program coordinator and other staff to insure that the programs were meeting inmate needs.

Defendant Jon Litscher has been Secretary of the Wisconsin Department of Corrections since January 4, 1999.[1] He has general supervisory authority over the department's operations but he does not oversee the day to day operations of individual health service professionals employed at the state's correctional facility. Defendant Stephen Puckett has been employed as a correctional services manager at the Bureau of Classification and Movement of the Wisconsin Department of Corrections since April 1992. In this capacity, defendant Puckett is responsible for supervising all the functions of the Bureau, including the administration of the department's inmate classification system. The inmate classification system is used for making security classification determinations as to new and existing inmates and for determining institutional placement for offenders incarcerated in adult institutions operated by the Department of Corrections and in the legal custody of the department who are confined in out-of-state contract facilities. Placement determinations are made with regard to the space available at various institutions and an inmate's security designation, special program needs and in some instances, parole eligibility and mandatory release date.

Since October 17, 1999, defendant Gary Blackbourn has been a captain at the Boscobel facility. In that position, he is responsible for inmate custody, security support and liaison services in conjunction with other institution initiatives. Additionally, he is responsible for developing, implementing, and coordinating health and safety policies. At all material times, defendant Blackbourn has known that plaintiff was receiving mental health care.

Defendant Jeffrey Hrudak has been employed at the Secure Program Facility as an offender classification specialist since October 8, 2001. Defendant Trina Kroening held that post from June 1999 through October 8, 2001. Offender classification specialists determine each offender's risk of violence, assaultive behavior, misconduct, escape and continued criminal activities, determine each inmate's programming needs, provide due process safeguards for the inmates and hold staff meetings to determine inmate placement that insures public, staff and offender safety. Defendant Karla Stelpflug has been employed as a teacher at the Secure Program Facility since May 7, 2000. Her duties are to develop and implement a program of professional academic services to inmates.

---

1. Although defendant Litscher has been succeeded by Matthew Frank, plaintiff did not amend his complaint to add Frank as a defendant, The automatic substitution provisions of Fed.R.Civ.P. 25(d) do not apply because the suit is for money damages.

Since September 10, 2000, defendant Vicki Sebastian has been employed at the Secure Program Facility as a corrections program supervisor. She is responsible for planning, coordinating and administering special programming and developing and implementing institution goals, budget, policy, and procedures. Defendant Sebastian's contact with plaintiff includes sending him certain programming materials, answering correspondence from him and sitting in on a meeting of the Program Review Committee when it was considering plaintiff's placement. At all relevant times, defendant Sebastian has been aware that plaintiff has been receiving mental health care.

Defendant Linda Oatman has been employed as a librarian at the Wisconsin Secure Program Facility since January 18, 2000. Under the general supervision of the Education Director, she directs the provision of library services to inmates and staff. Library services include a general library, a law library, inmate photocopy process, an automated circulation and on-line catalog system.

Defendant Brian Kool has been a corrections unit supervisor at the Wisconsin Secure Program Facility since February of 2001. Prior to that time, he had served as a crisis intervention worker beginning December 6, 1999. In his capacity as unit manager, defendant Kool is responsible for the security, treatment and general living conditions of all inmates assigned to the unit. He supervises staff and makes decisions about inmate movements between units. While he was employed as a crisis intervention worker, his job duties included monitoring inmates' behavior, responding to staff requests to interview or intervene with inmates and making recommendations for the care of inmates or their placement in observation status. During this time, he recommended plaintiff's placement on observation status at least twice, once because plaintiff had scratched himself with a razor blade and once after plaintiff reported having taken 30 Thorazine pills. Defendant Kool had fairly regular contact with plaintiff and is aware of his mental illness.

Defendants Berge, Puckett, Hrudak, Kroening and Stelpflug believe that plaintiff presents such a danger to correctional staff and other inmates that the Secure Program Facility is the only correctional institution in Wisconsin with the capacity to house him safely. No defendant intended to harm plaintiff.

B. *Plaintiff's Mental Health History*

Plaintiff has been hearing voices since he was five years old. He did not receive any treatment until 1991, when he was placed at Mendota Mental Health Institute for evaluation. Since that time, various psychologists have diagnosed plaintiff with paranoid schizophrenia, depression, psychosis, schizoaffective disorder and other mental illnesses. Some of the psychologists who have evaluated plaintiff have indicated that they suspect that he might be malingering with respect to some and possibly all of his symptoms. In April 1992, Scarver was placed at Dodge Correctional Institution. Shortly thereafter, he was transferred to the Columbia Correctional Institution.

In 1991, prison officials found a hacksaw blade in plaintiff's cell. While incarcerated at the Columbia facility, plaintiff attempted suicide twice and complained of hearing voices. On May 7, 1992, the staff psychologist at the Columbia facility noted that "something is seriously wrong with [him]." In December 1992, plaintiff set himself on fire, causing burns for which he was taken to a hospital for treatment. In May 1993, plaintiff cut his wrists with a razor blade. Security guards found plaintiff in his cell with a "puddle of blood" on the floor. Plaintiff was sent to the Wisconsin Re-

source Center in 1993 for mental health treatment, where he allegedly planned to rape a female staff member and then escape with hostages by driving a garbage truck through a fence. He was returned to a maximum security prison after just one month at the Resource Center. In November 1994, plaintiff murdered two other inmates at the Columbia facility. More than over ten years ago, plaintiff attacked five guards with a piece of wood with nails in it, hitting three of the guards in the head. All five had to be treated at a hospital.

In July 1995, plaintiff was transferred to a federal prison in Colorado, where he remained until 2000. Immediately before the transfer, a staff psychiatrist conducted a psychiatric evaluation of plaintiff. She noted in her report that there was no evidence that plaintiff suffered from a major mental disorder that would require treatment or prescribed medication. The following November, a different psychologist decided that plaintiff would benefit from an antipsychotic medication. On August 9, 1997, plaintiff was placed on a special housing unit and shortly thereafter given a psychiatric evaluation by a psychologist who noted in his report that plaintiff's psychological adjustment was "unsatisfactory."

While at the Colorado facility, plaintiff participated in both educational and psychological programming. In addition, he was permitted to work and was given audio tapes to help him relax and quiet the voices in his head. Prison records from the Colorado facility indicate that plaintiff was a willing worker with an above-average interest in a job, required "little supervision" and was "friendly, congenial, helpful." Plaintiff had daily contact with other inmates in the recreation yard. He made no attempts on his own life and received only two minor misconduct reports, one for refusing to take a drug test and the other for possessing an unauthorized item.

## C. Conditions at the Wisconsin Secure Program Facility

On April 11, 2000, plaintiff was transferred from the Colorado federal prison to the Wisconsin Secure Program Facility in Boscobel, Wisconsin. The decision to place plaintiff at the Secure Program Facility was made by the program review committee, which reviewed plaintiff's offense information, sentence structure, escape history, conduct record, emotional and mental health program needs and his history of significant institutional misconduct. When plaintiff learned of the recommendation that he be sent to the Secure Program Facility, he wrote to his social worker, Barbara Zink, objecting to the transfer because he viewed it as a violation of his plea agreement and because he thought that the socially isolating conditions would exacerbate his mental illness. When Zink responded that the transfer would be consistent with his plea agreement, plaintiff appealed the recommendation of the review committee formally. His appeal was denied.

The Wisconsin Secure Program Facility is the most secure correctional facility in the state; the cell design, staffing patterns and cell furnishings afford inmates fewer opportunities to injure others than traditional segregation cells at other maximum security facilities. Generally, inmates placed at the Secure Program Facility must progress through five levels before they are eligible to leave the facility. Under this level system, inmates who behave well are promoted to higher levels where they have more privileges. Inmates who do not comply with the rules are either denied promotions or demoted. On lower levels, inmates have fewer privileges and possessions.

The cell conditions are extremely isolating. Inmates are locked in their windowless cells for all but four hours each week and almost every aspect of their daily life is controlled and monitored. Social interactions and personal possessions are limited. Inmates on levels one through three are never allowed face-to-face contact with other inmates. They eat all of their meals alone in their cells, which can get very hot during the summer and which are constantly illuminated.

On the day plaintiff arrived, Twila Hagan, a psychologist at the Wisconsin Secure Program Facility, met with him to evaluate his mental health. She noted in her report from that meeting that plaintiff complained of hearing voices and had used "relaxation tapes and forms of distraction to ignore the voices." On April 19, 2000, Dr. Lou Fulton, a consulting psychiatrist at the Wisconsin Secure Program Facility, reported that plaintiff had a history of psychosis diagnoses, had been on antipsychotic medications, and had complained in the past of hearing voices.

Staff devised a "specialized treatment plan" that provided:

Mr. Scarver will be allowed to remain on Alpha unit when he is eligible to make it to level 2. On level 2 when Mr. Scarver would be eligible for a television, he will receive a Walkman and relaxation tape instead. The walkman and tape will be given to him in the evening after supper and retrieved in the morning before breakfast. He will, on level 2, be allowed to keep the walkman and tape a total of 12 hours each day and the walkman will be sealed and inspected when turned in to be sure it is not damaged and the seal is not broken. The purpose of the tapes are to help him sleep and screen out voices. If voices become problematic at other times of the day, adjustment to the time the tape and walkman is given out can

be made in consultation between Twila Hagan of clinical services and Brad Hompe the unit manager. Mr. Scarver will receive all the other privileges that are allowed on level 2. Mr. Scarver will be expected to conform his behavior and do the programming that is required for level 2. If his behavior is not satisfactory or he damages the walkman and/or tape, he will return to level 1 and start the process over. If the tape and/or Walkman is damaged, it will be a unit team (including Dr. Hagan) decision when it is returned after restitution is paid.

When Mr. Scarver is eligible for level 3, he will be moved to Echo unit and given all the privileges that go with level 3. If Mr. Scarver does not want a TV at that time, he will not be forced to accept one. He will be allowed to have his Walkman 24 hours per day and must turn it in for inspection once per day. If he wants a different tape, he will have to request it when he turns the walkman in for inspection. Mr. Scarver will have to conform to the requirements of level 3. If his behavior does not conform to expectations, he will receive demotions as any other inmate would and privileges would be adjusted accordingly.

Because of inmate Scarver's violent history and his high profile crimes, inmate Scarver cannot be moved into a general population environment. Due to his violent history and his high profile crimes, Mr. Scarver may be not only dangerous to others, but may also be in danger of other inmates either retaliating or trying to make a name for themselves. For these reasons, Mr. Scarver will not move into WSPF's discharge track by progressing to Level 4 or 5. If his behavior and programming work earns him level 4 privileges, he will progress to having the extra canteen, more phone call time, an expanded library list, face-to-face visitation, and more property. If

his behavior and programming work earns him level 5 privileges, he will progress to having the extra canteen, more phone call time, a full library list, face-to-face visitation, and added property that would be extended to inmates on level 5.

Plaintiff started his tenure on level 1. On June 19, 2001, he was recommended for a promotion to level 2. Initially, he resisted the promotion because level 1 was quiet. Despite his resistance, he was placed on level 2 on July 13, 2001 and remained there until he was demoted on January 9, 2002. On February 13, 2002, plaintiff was again recommended for a promotion to level 2 and again, he resisted the move. On June 3, 2002, he was promoted to level 3.

In May 2000, plaintiff overdosed on his prescribed antipsychotic medication, Thorazine. He took thirty pills that he had saved by pretending to take the pills as they were distributed and then hiding them in his clothing or above the ledge of his cell door. Plaintiff later said that he had taken the pills to get the voices inside his head to stop. As a result of the overdose, plaintiff was rendered unconscious, had to be revived and experienced intense stomach pain for a period after the incident. The doctor who revived plaintiff said that if prison officials had not found him when they did, plaintiff likely would have died.

In June 2000, plaintiff complained to Dr. Fulton that he continued to hear voices in his head and felt as though something was moving around inside of his brain. In November 2000, plaintiff complained to another psychologist that he heard voices inside his head constantly. The following month, plaintiff cut his head with a razor because he thought that he could cut out whatever was talking and moving inside his head. Also that month, plaintiff cut his wrists and wrote "To Thou's End" and

"Crucified" on his cell walls. After this incident, plaintiff was taken to the facility's clinical services and placed on observation status. While on observation status, plaintiff's clothes were stripped and he was placed in a cold cell without a mattress, blankets, pillow or sheets.

The medications plaintiff was taking can cause hypotension when combined with hot weather. As a result of the combined effect of his medication and the high cell temperatures, plaintiff was extremely uncomfortable during the summer months. During the summer of 2002, plaintiff stopped taking his medication regularly because of the heat. He indicated to a facility psychologist, Dr. Maier, that the voices inside his head came back when he missed his medications. Realizing that plaintiff might suffer from hypotension if he took his antipsychotic medication during the summer, Dr. Maier gave plaintiff a choice about taking his medication.

In early 2003, plaintiff took several 500 milligram Tylenol pills at one time. He was able to do so because he was given a 30-day supply packet containing 60 pills. Plaintiff was not able to eat for several days after the overdose. The active ingredient in Tylenol, acetaminophen, can cause liver failure when taken in large quantities and commonly is used to commit suicide.

On various occasions, plaintiff beat his head against his cell for prolonged periods of time. The pain and noise helped distract plaintiff from the voices in his head. Plaintiff told Dr. Maier that he wanted to "break [his head] open so that the voices can escape." In November 2000, plaintiff was denied an advancement to Level 3. The report explaining the decision for the denied promotion stated as follows:

> The incident of you banging your head on the wall and other bizarre behavior is not appropriate. We highly recommend that you cooperate w/ clinical services so

that advancement can be considered in the future.

On several occasions during 2000 and 2001, plaintiff requested the audio tapes that had been part of his treatment in federal prison, a keyboard, oil pastels and paper; plaintiff believed that these objects helped quiet the voices in his head. Plaintiff was told that he could not have audio tapes while on levels one and two. By October 2002, plaintiff was given the audio tapes he requested, but defendant Berge took them away in January 2003. Plaintiff was not given the art supplies he requested because of the security risk they posed.

Plaintiff's clinical records reflect that he engaged in self-destructive acts with greater frequency during the time he spent at the Wisconsin Secure Program Facility than during his time at the Colorado facility. The Boscobel facility was equipped to provide plaintiff with substantial mental health care; clinical workers, crisis intervention staff and the facility psychologist all provided professional mental health care. Plaintiff was seen often by the facility's psychologist and clinical staff and was prescribed a myriad of antipsychotic medications. Defendants' expert, psychologist Rodney Miller, believes that plaintiff's clinical files suggest that plaintiff may have had one of his most successful treatment experiences while incarcerated at the Wisconsin Secure Program Facility. In addition, Dr. Miller is of the opinion that the conditions to which plaintiff was subjected at the Secure Program Facility did not cause harm to his mental health and that plaintiff received regular, appropriate mental health treatment.

#### D. *Jones' El v. Berge*

In 2000, plaintiff and several other inmates at the Wisconsin Secure Program Facility sued defendants Litscher and Berge, contending that the conditions at the facility subjected inmates to cruel and unusual punishment in violation of the Eighth Amendment. *Jones' El v. Berge,* 00–C–421–C. The case was later certified as a class action and counsel appointed to represent the class. In 2001 and 2002, plaintiff adduced affidavits from corrections experts who stated that the conditions at the Secure Program Facility were severely detrimental to mentally ill inmates. One of these experts, Dr. Terry Kupers, noted the abnormally high rate of suicide at facilities like the Secure Program Facility and stated that he had "never seen this degree of purposefully designed isolation interspersed with maddening noise." In addition, he noted that many psychiatric medications interfere with the body's ability to regulate temperature and that around the country, several inmates taking psychiatric medications have suffered heat-related deaths. Dr. Kupers identified plaintiff as one of the mentally ill inmates who was not receiving the mental health treatment that his condition required. He believed that plaintiff's condition was made worse by the conditions of confinement at the facility and in particular, that the voices in plaintiff's head intensified as a result of the extremely isolating cell conditions. Dr. Kupers recommended that plaintiff be transferred to a mental health treatment center.

The plaintiffs in the *Jones' El* case moved for a preliminary injunction that focused exclusively on the practice of housing mentally ill patients at the Secure Program Facility. After finding that the socially isolating, sensory deprived conditions at the prison were potentially devastating to seriously mentally ill inmates, I granted plaintiffs' motion in an order dated October 10, 2001. As a result of this order, defendants were required to transfer seriously mentally ill inmates out of the facility. However, defendants were not ordered to move plaintiff, who was identified in the order as "Prisoner 6,"

because of the special security problems he posed.

The *Jones' El* suit eventually settled. Part of the court approved settlement agreement provides as follows:

1. No seriously mentally ill inmate (as defined in the April 15, 2002 order) shall be incarcerated at [WSPF] or transferred there without notice to plaintiffs' counsel.

(a) If defendants wish to transfer a seriously mentally ill inmate to [WSPF], they must provide plaintiffs' counsel at least ten (10) days' advance notice and must stay any transfer pending resolution of any objections plaintiffs' counsel raise to the proposed transfer.

(b) If defendants wish to retain a seriously mentally ill inmate at [WSPF], they must advise plaintiffs' counsel of their intention promptly.

2. No seriously mentally ill inmate is to be transferred to [WSPF] unless defendants can

(a) Document his dangerousness;

(b) List all of the potential alternative placements, both in Wisconsin and outside the state, that defendants have considered and explain why none of them is feasible; and

(c) Identify the additional services that will be provided to the inmate to help him with his serious mental illness and to ameliorate the effect of the conditions at [WSPF] have on that illness.

### E. *Alternative Confinement Available*

Although the Wisconsin Resource Center has a security unit, space in this unit is limited and the level of security does not begin to approach that provided in a maximum security segregation unit. Because his past displayed proclivity for violent conduct, plaintiff could not be housed at the Wisconsin Resource Center without posing a risk of serious harm to other persons working or residing there. Plain-

tiff was treated at the Wisconsin Resource Center in 1993 but was returned to a maximum security facility after just one month because of the security threat he posed. Security staff at the Wisconsin Resource Center are adamant in refusing plaintiff re-admission. In addition, plaintiff is subject to a "Special Placement of Inmate" restriction under which he is not to be housed with two particular inmates who are currently confined at the Wisconsin Resource Center. Transferring plaintiff to the Wisconsin Resource Center would jeopardize the safety and well-being of these two other inmates.

### F. *Current Confinement*

On June 5, 2003, the Wisconsin Department of Corrections Program Review Committee decided to transfer plaintiff from the Wisconsin Secure Program Facility because he was determined to be seriously mentally ill. Currently, plaintiff resides at the San Carlos Correctional facility in Pueblo, Colorado. At this facility, plaintiff is permitted to interact with staff and other inmates, leave his cell on a daily basis and is given art supplies. In addition, he sees a therapist more frequently than he did at the Secure Program Facility. Plaintiff believes his mental health has improved since arriving at the San Carlos facility. In a June 2004 progress assessment summary, plaintiff was described as "amenable to treatment and not [ ] a management problem." A psychologist at the San Carlos facility classified plaintiff as continuing to have "moderately severe" mental health needs. In a March 2004 evaluation report, he noted that plaintiff wore homemade earplugs and made scratching noise on his jacket to help him drown out the voices in his head. Plaintiff has not received any conduct reports at the Colorado facility.

### G. Ongoing Security Threat

Dr. Rodney Miller, a clinical psychologist who performed a psychological evaluation of plaintiff and has reviewed his clinical record, believes that plaintiff presents a serious ongoing threat of aggression and must be closely monitored and separated from other inmates to prevent him from assaulting and possibly killing others. It is Dr. Miller's opinion that plaintiff believes he has nothing to lose by committing assaultive and murderous acts and that he has no remorse for the pain he has caused others. In the past, plaintiff has indicated that he views violence as a tool that he can use to command and maintain respect. From his evaluation of plaintiff and review of his clinical file, Dr. Miller believes that plaintiff would kill again if given the chance.

Defendant Berge shares Dr. Miller's belief that past acts of violence are good indicators of future violent conduct. He believes that plaintiff must be subject to a level of restraint comparable to that found at the Wisconsin Secure Program Facility in light of his past violent and disruptive conduct.

## OPINION

### A. Issue and Claim Preclusion

Before turning to the merits of plaintiff's claim, defendants have raised several preliminary issues. The first of these is whether the doctrines of claim and issue preclusion bar plaintiff from litigating his Eighth Amendment claims in light of the settlement agreement in *Jones' El*. Claim preclusion, or res judicata, "is an affirmative defense designed to prevent the 'relitigation of claims that were or could have been asserted in an earlier proceeding.'" *Rizzo v. Sheahan*, 266 F.3d 705, 714 (7th Cir.2001) (citation omitted). "A consent decree is res judicata and thus bars either party from reopening the dispute by filing a fresh lawsuit." *United States v. Fisher*,

864 F.2d 434, 439 (7th Cir.1988) (internal citations omitted); *see also* 18 Moore's Federal Practice, § 131.30[3][c][ii] (Matthew Bender 3d ed.) (consent judgments "have the claim preclusive effect of any other final judgment on the merits."). Issue preclusion, or collateral estoppel, refers "'to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim.'" *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citing *Restatement (Second) of Judgments* §§ 17, 27 (1980)). Although consent judgments ordinarily support claim preclusion, they generally do not support issue preclusion. 18A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4443, at 265 (2d ed.2002).

■ Neither claim or issue preclusion bars plaintiff from litigating his claim for money damages. (Plaintiff is no longer seeking injunctive relief in light of his transfer to the San Carlos Correctional facility in Pueblo, Colorado.) As plaintiff observes, the claims in *Jones' El* were certified under Fed.R.Civ.P. 23(b)(2), which provides for declaratory and injunctive relief only. "Where 'a prisoner seeks damages for allegedly unconstitutional conditions of confinement he is not precluded by an earlier class action in which only declaratory and injunctive relief were sought.'" *Gonzalez v. Litscher*, 230 F.Supp.2d 950, 959 (W.D.Wis.2002) (citing *Crowder v. Lash*, 687 F.2d 996, 1008–09 (7th Cir.1982)); *see also Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir.1996) ("[T]he general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class members, even if

based on the same events."). In the order approving the settlement agreement in *Jones 'El,* I made it clear that because the plaintiffs' claim for relief was limited to injunctive and declaratory relief only, "class members remain free to file individual suits for money damages for injuries they believe they have suffered during their incarceration at [the Wisconsin Secure Program Facility]". *Jones 'El,* 00–C–421–C, dkt. # 207, at 6 (WD.Wis. Mar. 8, 2002).

In their reply brief, defendants appear to concede that plaintiff's claim for monetary damages is not barred by issue or claim preclusion, at least up through June 24, 2002, the date on which final judgment was entered in *Jones 'El* was entered. Defendants are mostly right; plaintiff is precluded from seeking monetary damages for injuries incurred after March 28, 2002, the date on which the settlement agreement was approved. *See, e.g., Tiggs v. Berge,* 2002 WL 32342678, *2 (W.D.Wis. Nov.14, 2002).

In addition, defendants suggest in a single sentence in their reply brief that plaintiff's claim that defendants acted with deliberate indifference to his mental health care needs is barred because in 2000, I denied plaintiff leave to proceed on a similar claim for failure to state a claim on which relief could be granted. *Scarver v. Litscher,* 00–C–711–C (W.D.Wis. Dec. 20, 2000). Arguments raised for the first time in a reply brief are deemed waived as are arguments that are not meaningfully developed. *Carter v. Tennant Co.,* 383 F.3d 673, 679 (7th Cir.2004) (arguments first raised in reply are deemed waived); *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived."). Both issue and claim preclusion are affirmative defenses and as such, subject to waiver if not properly raised. *Crowder,* 687 F.2d at 1008 (claim preclusion is an affirmative defense); *Freeman United Coal Mining Co. v. Office of· Workers' Compensation Program,* 20 F.3d 289, 294 (7th Cir.1994) (issue preclusion is an affirmative defense); Fed. R.Civ.P. 8(c). Even if defendants had raised this argument appropriately, plaintiff filed his complaint in 00–C–711–C just a few months into his stay at the Secure Program Facility. Because claim preclusion operates in this case to bar only a small portion of the damages plaintiff might otherwise have recovered, defendants are not entitled to summary judgment on preclusion grounds.

### C. *Mental or Emotional Injury Damages*

■ Next, defendants argue that plaintiff's claims are barred under 42 U.S.C. § 1997e(e), which provides that

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

Defendants argue that this provision bars plaintiff's claims because he has not alleged that he suffered physical harm as a result of the alleged violations. It is not clear why defendants made this argument; plaintiff alleged expressly in his amended complaint that "[o]n at least two occasions while at [the Wisconsin Secure Program Facility], due to his worsening mental illness, [plaintiff] has inflicted serious harm upon himself. On one occasion, [plaintiff] cut himself with a razor. On another, [plaintiff] attempted suicide by swallowing 30 tablets of Thorazine." Am. Cpt., dkt. # 25, at 7, at ¶ 33.

Even if defendants were correct that plaintiff had not alleged that he suffered physical harm, they would not be entitled to summary judgment. The Court of Ap-

peals for the Seventh Circuit has interpreted § 1997e(e) to foreclose the ability of a litigant who has not suffered physical injury to obtain compensatory damages for mental or emotional injury; in doing so, the court rejected the idea that this provision makes a physical injury a filing prerequisite. *Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir.2003). A plaintiff who has suffered psychological torture but not physical injury may still obtain nominal or punitive damages. *Id.* at 940–41. In his prayer for relief, plaintiff requested both compensatory and punitive damages.

### D. *Merits*

■ The Eighth Amendment prohibits conditions of confinement that "involve the wanton and unnecessary infliction of pain" or that are "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In addition, the Supreme Court has recognized that deliberate indifference to prisoners' serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Before analyzing plaintiff's claims, it is necessary to identify the precise nature of those claims. It appears that there may be some confusion on the matter. The logical place to start is the governing complaint. Plaintiff's amended complaint includes four distinct counts: (1) defendants violated plaintiff's Eighth Amendment rights by transferring him to the Wisconsin Secure Program Facility; (2) defendants acted with deliberate indifference to plaintiff's serious mental health care needs by failing to screen plaintiff for mental health problems before transferring him; (3) defendants subjected plaintiff to cruel and unusual punishment by placing him in conditions of extreme social and sensory deprivation; and (4) defendants acted with deliberate indifference to plaintiff's need for care for his serious mental illness.

Counts one and two do not state individual Eighth Amendment violations but are theories as to how individual defendants might be found to be personally involved in the other two alleged Eighth Amendment violations. (There is nothing inherently harsh about a transfer or not being screened for mental illness but an official might be held liable under § 1983 if he made or participated in the decision to transfer an inmate to a facility where he would face inhumane conditions or if the official's failure to conduct a mental health screening before an inmate's transfer was found to constitute deliberate indifference to a risk of serious harm.)

This leaves two theories of Eighth Amendment violation, one focusing on the conditions of confinement to which plaintiff was subject and the other on the mental health care made available to him. At summary judgment, plaintiff presses his conditions of confinement claim while defendants focus their energies on disproving plaintiff's charge that he was not provided adequate treatment for his serious mental illness. It is not clear whether this is the result of tactical decisions or whether either side has conflated these two claims. Whatever the case, I will analyze the two claims separately; although there may be some overlapping facts, neither theory is dependent on the other.

### 1. *Deliberate indifference to serious mental health care needs*

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. DeTella,* 95 F.3d 586, 590 (7th Cir.1996) (citing *Estelle,* 429 U.S. at 103, 97 S.Ct. 285). Deliberate indifference to a prisoner's serious medical needs con-

stitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285. Plaintiff contends that defendants were deliberately indifferent to his serious mental health care needs. In order to defeat defendants' motion for summary judgment, plaintiff must adduce evidence from which it can be inferred that he had a serious mental health need (objective component) and that prison officials were deliberately indifferent to this need (subjective component). *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir.1997).

a.   Serious medical needs

"Serious medical needs" encompass conditions that are life-threatening or that carry risks of permanent serious impairment if left untreated, those that result in needless pain and suffering when treatment is withheld and those that have been diagnosed by a physician as mandating treatment. *Gutierrez*, 111 F.3d at 1371–73. It is well-settled that suicide is an objectively serious harm. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir.2003); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir.2001). Defendants do not deny that plaintiff is seriously mentally ill and that he has attempted to commit suicide on a number of occasions. Plaintiff has been prescribed a variety of antipsychotic medications, he intentionally overdosed on Thorazine and the physician treating him indicated that he might have died from the overdose had security officers not intervened. Plaintiff has slit his wrists, cut into his head with a razor blade and banged his head against his cell wall until it bled. There is ample evidence from which a jury could infer that plaintiff's need for mental health care was serious. Thus, I turn to the question whether any named defendant was deliberately indifferent to plaintiff's mental health care needs.

b.   Deliberate indifference

The subjective element requires that the prison official act with a sufficiently culpable state of mind. *Gutierrez*, 111 F.3d at 1369. To show deliberate indifference, a plaintiff must establish that the official was "subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed" to his health. *Wynn v. Southward*, 251 F.3d 588 (7th Cir.2001). Although "a prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired," *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir.1996), inadvertent error, negligence, ordinary malpractice, or even gross negligence is insufficient. *Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515 (7th Cir.2002).

As noted above, plaintiff makes very few arguments related to his claim that defendants exhibited deliberate indifference by denying him mental health care. As a result, it is difficult to discern his theory as to that claim. Plaintiff's most probative evidence on point is that he was not given the therapeutic tapes and art supplies when he requested them. There is no evidence to put into dispute defendants' sworn statements that the decision to deny plaintiff these items was motivated by security concerns. The mere fact that plaintiff did not use these items inappropriately when he received them might suggest that defendants acted with more caution than hindsight showed was necessary, but it does not prove that they were deliberately indifferent. Plaintiff's disagreement with defendants' balancing of the threat he posed versus the potential therapeutic value of the items he requested is constitutionally inconsequential. *Snipes*, 95 F.3d at 592. Dissatisfaction with a course of treatment does not give rise to a constitutional claim "unless the medical treatment

is 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.'" *Id.* (quoting *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974)).

The record reflects that plaintiff received extensive mental health care treatment while he was incarcerated at the Secure Program Facility; plaintiff was seen by the facility's psychologist often and he was prescribed a myriad of antipsychotic medications. Of course, an Eighth Amendment violation might exist despite the provision of extensive health care when there are markedly atypical and non-isolated periods of neglect. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir.1999) (mistreatment for a short period of time may be evidence of a culpable mental state). However, the rule stated in *Reed* does not apply because plaintiff has not identified any similar non-isolated periods of disregard. The record does not show that any named defendant acted with deliberate indifference to plaintiff's serious need for mental health care. Therefore, defendants' motion for summary judgment will be granted as to this claim.

2. *Conditions of confinement*

■ Plaintiff's second claim is that defendants subjected him to conditions of confinement that amounted to a kind of psychological torture when combined with his mental illness. These included being locked in a windowless and constantly illuminated cell for all but four hours each week, subjected to extreme heat in the summer and deprived of nearly all social interaction and personal possessions. Like most other claims under the Eighth Amendment, a claim asserting cruel and unusual conditions of confinement must satisfy a two-part test, with a subjective and an objective component. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff must show both that the conditions to which he or she is subjected are "sufficiently serious" (objective component) and that defendants are deliberately indifferent to the inmate's health or safety (subjective component). *Id.*

a. Sufficiently serious conditions

Generally, the standard for determining whether prison conditions satisfy the objective component of the Eighth Amendment focuses on whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society." *Farmer,* 511 U.S. at 833–34, 114 S.Ct. 1970 (internal quotations omitted). To meet this standard, the deprivation must be "extreme"; mere discomfort is not sufficient. *Hudson v. McMillian,* 503 U.S. 1, 8–9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Supreme Court has recognized that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 305, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

The Eighth Amendment protects inmates' mental health as well as their physical health. *See, e.g., Calhoun,* 319 F.3d at 940 (Eighth Amendment prohibits malicious and sadistic infliction of psychological torture); *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987). As I noted in granting in part the motion for preliminary injunction brought by the *Jones' El* plaintiffs, "'[i]f the particular conditions of [confinement] being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defen-

dants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture.'" *Jones 'El v. Berge*, 164 F.Supp.2d 1096, 1117 (W.D.Wis.2001) (quoting *Madrid v. Gomez*, 889 F.Supp. 1146, 1264 (N.D.Cal.1995)).

In *Jones 'El*, I reasoned that although many of the conditions at the Wisconsin Secure Program Facility, such as twenty-four hour illumination, near constant in-cell confinement, the absence of windows and adequate heat management and infrequent human interaction, would not constitute a violation of the Eighth Amendment individually, they could have a mutually enforcing effect causing the deprivation of a prisoner's basic human need for social interaction and sensory stimulation. *Id.* at 1117–20. As I also concluded, "most inmates have a difficult time handling these conditions of extreme social isolation and sensory deprivation, but for seriously mentally ill inmates, the conditions can be devastating." *Id.* at 1098. Although inmates are allowed additional privileges on higher levels, seriously mentally ill inmates may not have the cognitive wherewithal to conform their behavior so that they can be promoted to a higher level. *Id,* at 1120.

Plaintiff has adduced evidence showing that although he had not engaged in any serious acts of self-harm for the five years prior to his transfer, within a relatively short time after his transfer to the Secure Program Facility, he attempted suicide on multiple occasions, slitting his wrists and overdosing on medication. Defendants attempt to mitigate this evidence by pointing out that plaintiff had suffered from mental illnesses throughout his incarceration at the federal facility in Colorado as well. Although there is evidence bearing this out, plaintiff's mental illness did not manifest itself in acts of self-harm during that time. Given the otherwise unexplained marked increase in the frequency and severity of plaintiff's acts of self-inflicted injury, a reasonable finder of fact could infer that the conditions to which plaintiff was subjected at the Secure Program Facility triggered his previously latent proclivity for engaging in acts of serious self-harm.

As for the notion that the severity of the conditions might be alleviated as an inmate moves up the level system, plaintiff has submitted evidence confirming the concern I expressed in *Jones 'El* that these privileges would not be meaningfully available to inmates who are so mentally ill that they are unable to conform their behavior in the manner required to move up through the system. Plaintiff was denied a promotion to. Level 3 because he had been banging his head against the wall, but as plaintiff suggests and defendants do not deny, he was banging his head against the wall because of his mental illness. Defendants suggest that they adopted a "specialized treatment plan" designed to assist plaintiff through the level system. However, their own description of this plan shows that they did not modify the requirements for progressing through the level system to account for plaintiff's mental illness but instead restricted the privileges he would obtain at each level and prohibited him from enjoying all of the privileges of levels four and five. This treatment plan cuts against defendants' position; it insured that plaintiff would continue to be subjected to the most desolate levels of confinement no matter how well he managed to control his behavior.

Because plaintiff has submitted evidence from which a reasonable inference may be drawn that the isolating and disorienting conditions of confinement would exacerbate the threat that he would engage in acts of grave self-injury, I conclude that he has satisfied his burden as to the objective prong. *Madrid,* 889 F.Supp. at 1264; *cf. Cherry v. Litscher,* 2002 WL 32350052, *3

(W.D.Wis. Nov. 22, 2002) (in order to succeed on sensory deprivation claim, a plaintiff must submit evidence showing that he was actually subjected to conditions about which he complained); *Tiggs v. Berge*, 2002 WL 32342678, *6 (W.D.Wis. Nov. 14, 2002) (findings of fact in *Jones 'El* limited to that case; plaintiff must prove his own sensory deprivation claim).

### b. Deliberate indifference

Having concluded that the conditions of plaintiff's confinement were sufficiently serious, I turn again to the issue of deliberate indifference. As I have already indicated, this standard is satisfied when a state official knows of and disregards an excessive risk to an inmate's health or safety. As plaintiff notes, defendants Litscher, Berge and Huibregtse knew of the stark and isolating conditions plaintiff would face at the Wisconsin Secure Program Facility and that plaintiff suffered from severe mental illness that had led him to engage in acts of self-harm in the past. Because "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970, plaintiff contends that a reasonable jury could conclude that these defendants knew that there was a serious risk that plaintiff would engage in acts of self-harm and suffer psychological torture if placed at the Boscobel facility.

In making his deliberate indifference argument, plaintiff focuses on defendants Litscher, Berge and Huibregtse. It is not clear whether plaintiff intended to waive his claims against the other named defendants; he makes no attempt in his brief to explain why they might be held liable. Regardless whether plaintiff intended to waive these claims, there is no evidence showing that defendants Sebastian, Oatman, Kool, Blackbourn, Stelpflug, Waltz or Holden were personally involved in subjecting plaintiff to the conditions about which he complains. It is well established that liability under § 1983 must be based on a defendant's personal involvement in the constitutional violation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir.1994); *Morales v. Cadena*, 825 F.2d 1095, 1101 (7th Cir. 1987); *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf–Lillie*, 699 F.2d at 869. None of these defendants had any apparent control over the policy of keeping inmates locked in constantly illuminated, window-less cells 23 to 24 hours each day or any say in the decision to transfer plaintiff to the facility. Accordingly, they are entitled to summary judgment on plaintiff's conditions of confinement claim.

However, there is sufficient evidence to support a finding that defendants Berge, Huibregtse, Litscher, Puckett, Hrudka and Kroening were personally involved. Given the positions they held, it could be inferred that defendants Berge, Huibregtse and Litscher made or took part in the decision to allow placement of mentally ill inmates in the Wisconsin Secure Program Facility. Defendants Puckett, Hrudka and Kroening each held positions in which they participated in individualized placement decision. Thus, it could be inferred that each had some part in the particular decision to transfer plaintiff from the federal facility in Colorado to Boscobel.

Defendants focus on plaintiff's past violent behavior, arguing that because plaintiff is so dangerous, he could not be confined at any other Wisconsin state facility. Thus, defendants reason, the only reasonable conclusion is that they were motivated by security concerns when they placed plaintiff at the Wisconsin Secure Program Facility. Although an inmate's conduct is

relevant in determining whether a defendant was "deliberately indifferent," *Pearson v. Ramos*, 237 F.3d 881 (7th Cir.2001); *Lunsford v. Bennett*, 17 F.3d 1574, 1581–82 (7th Cir.1994), it is not enough to cite a prisoner's history of misconduct and conclude that any measure of restraint is appropriate. Even recalcitrant prisoners are entitled to the minimal civilized measure of life's necessities. The question is whether even in spite of the misconduct, the deprivation "does so much harm to a prisoner that it is intolerable to the sensibilities of a civilized society no matter what the circumstances." *Pearson*, 237 F.3d at 885.

(Defendants make much of the fact that I made an exception for plaintiff in granting the *Jones 'El* plaintiff's motion to preliminarily enjoin the practice of housing mentally ill inmates at the Wisconsin Secure Program Facility. However, this conclusion related to the issue whether plaintiff was an appropriate candidate for injunctive relief and not whether the limited options for plaintiff's placement showed that defendants had not acted with deliberate indifference. Thus, it is not conclusive in this case.)

Defendants face a daunting task incarcerating an individual with plaintiff's violent history. I understand that plaintiff presents a substantial threat not only to himself but to other inmates and prison staff. Were incarceration in the Wisconsin state prison system the only option available, I might be inclined to agree with defendants that they acted properly in housing plaintiff at the Secure Program Facility. However, that is not the case here. Plaintiff was transferred from a facility that all record evidence suggests provided ample security without subjecting him to the kind of extreme deprivations he suffered at the Secure Program Facility. Defendants do not attempt to explain, much less justify the reasoning for the decision to transfer plaintiff. As I noted

in *Jones 'El*, 164 F.Supp.2d at 1102, the Wisconsin Secure Program Facility is a 500–bed prison that was constructed in response to the state wardens' collective request for 200 new segregation or high security cells. Furthermore, it is undisputed that plaintiff was being incarcerated at the federal facility in Colorado under contract and undoubtedly at some cost. A jury might reasonably couple this information and conclude that security concerns were not the driving force behind the decision to transfer plaintiff.

On this record, I must agree with plaintiff. The evidence supports a reasonable inference that defendants Berge, Huibregtse, Litscher, Puckett, Hrudka and Kroening knew of the severe conditions inmates face at the Wisconsin Secure Program Facility and that plaintiff suffered from severe mental illness and in the past, had inflicted serious injury to himself. Certainly, a jury could conclude that they should have known that subjecting a person with plaintiff's severe mental illness and history of self-injury to conditions so lacking in physical and social points of reference would lead to a kind of psychological torture and future acts of self-harm.

### E. *Qualified Immunity*

■ Alternately, defendants seek protection under the doctrine of qualified immunity. Qualified immunity protects state officials performing discretionary functions who are sued in their individual capacities against liability for monetary damages as long as their actions did not " 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Once a defendant raises qualified immunity as a defense, the plaintiff must show that the

record supports a finding of unconstitutional conduct and that the applicable constitutional standards were clearly established at the time in question. *Tun v. Whitticker,* 398 F.3d 899, 901–02 (7th Cir. 2005); *Newsome v. McCabe,* 319 F.3d 301, 303 (7th Cir.2003); *Magdziak v. Byrd,* 96 F.3d 1045, 1047 (7th Cir.1996). For the reasons explained above, I have already concluded that the record would support a finding that defendants Berge, Huibregtse, Litscher, Puckett, Hrudka and Kroening violated plaintiff's Eighth Amendment rights by subjecting him to conditions of extreme sensory and social deprivation.

As for the question whether the applicable constitutional standards were clearly established at the time, plaintiff cites several cases standing for the proposition that deliberate indifference to a serious risk of suicide violates the Eighth Amendment. Although this general proposition was clear at the relevant times, the law surrounding a sensory deprivation and social isolation claim was far more fuzzy. In determining whether the constitutional standards at issue was clearly established, courts ask whether "it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted."* *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2004) (emphasis added). In other words, "a right must be established at the 'appropriate level of specificity before a court can determine if it was clearly established.'" *Baird v. Board of Educ. for Warren Community Unit School Dist. No. 205,* 389 F.3d 685, 696 (7th Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)); *see also Carlson v. Gorecki,* 374 F.3d 461, 466 (7th Cir.2004) ("The test for whether the law was clearly established must be conducted based on the specific facts of the case, and not at a high level of generality.").

In another lawsuit filed in this court, *Freeman v. Berge,* 03–C–21–C, I concluded that as of March 2002, there was no clearly established law that subjecting prisoners to social isolation and sensory deprivation violated the Eighth Amendment. *Freeman v. Berge,* 283 F.Supp.2d 1009, 1015–17 (W.D.Wis.2003). In coming to this conclusion, I noted that in the most analogous case decided by the Court of Appeals for the Seventh Circuit, *Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980), the court held: "Inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time." As I explained in *Jones' El,* however, *Bono* does not stand for the proposition that claims of social isolation and sensory deprivation can never amount to violations of the Eighth Amendment. Courts in other jurisdictions have held that prolonged periods of extreme sensory deprivation and social isolation may violate the Eighth Amendment and since the time the court of appeals decided *Bono,* a growing consensus has emerged among mental health professionals that solitary confinement can have severe deleterious effects on an inmate's mental health. *Freeman,* 283 F.Supp.2d at 1016. Nonetheless, I concluded that

> with *Bono* as the only case as a guide in this circuit, it would not be unreasonable for a prison official to believe that constant cell illumination, audio and visual monitoring and lack of access to the outdoors did not violate the Eighth Amendment, alone or in combination. Although the determination whether a law is clearly established is not limited to a review of cases in this circuit, I cannot say that there was such a "clear trend" in the case law from other courts that it was "merely a question of time" that the right would be recognized by the Court of Appeals for the Seventh

Circuit. *Jacobs v. City of Chicago,* 215 F.3d 758, 767 (7th Cir.2000).

*Id.*

Only two of the cases I cited in *Freeman, Ruiz v. Johnson,* 37 F.Supp.2d 855, 915 (S.D.Tex.1999) and *Madrid v. Gomez,* 889 F.Supp. 1146, 1264 (N.D.Cal.1995), distinguished between inmates with average psychological profiles and those suffering from mental illnesses. Because both were decided by district courts, they have no precedential weight. *Anderson v. Romero,* 72 F.3d 518, 525 (7th Cir.1995) ("Taken together with other evidence, [district court opinions] might show that the law had been clearly established," but because they have no weight as precedent, they "cannot *clearly* establish a constitutional violation."). Additionally, these cases appear relatively isolated and thus, cannot be said to establish the kind of clear trend that would put defendants on fair notice that their conduct was unconstitutional. *Jacobs,* 215 F.3d at 767.

Furthermore, in *Bono,* the court of appeals acknowledged that prison officials and not doctors decided whether to transfer an inmate out of the control unit challenged in that case and that not all inmates placed in that unit had been given a psychological screening. Under these circumstances, it would have been possible if not probable that at least some inmates in the control unit suffered from mental illness. Nothing in the court's opinion suggests that it was particularly concerned about that possibility. I continue to adhere to my original understanding that *Bono* too does not bar sensory deprivation claims altogether but rather, holds that their viability is a matter of degree. In other words, determining whether conditions are so isolating as to rise to the level of an Eighth Amendment is a multi-factored analysis in which an inmate's pre-existing psychological welfare is but one consideration. Nonetheless, as relevant to the issue of qualified immunity, *Bono* can be read as rejecting the notion that there might be a bright-line rule that mentally ill inmates may never be subject to any forms of sensory deprivation.

Plaintiff's claim differs from *Freeman's* in degree and not type. Thus, my holding in that case is largely conclusive here. Plaintiff has not cited any other case showing that the viability of an Eighth Amendment claim premised on sensory deprivation and social isolation was significantly more well established with respect to mentally ill prisoners than it was with respect to other inmates. *Crue v. Aiken,* 370 F.3d 668, 680 (7th Cir.2004) (burden of proving right clearly established falls on plaintiff); *McGreal v. Ostrov,* 368 F.3d 657, 683 (7th Cir.2004) (plaintiff satisfies burden of proving violation clearly established by pointing to closely analogous cases). Accordingly, I must conclude that defendants Berge, Huibregtse, Litscher, Puckett, Hrudka and Kroening are entitled to qualified immunity.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Jon Litscher, Gerald Berge, Peter Huibregtse, Jeffrey Hrudka, Vicki Sharpe, Linda Oatman, Brian Kool, Gary Blackbourn, S.M. Puckett. Tina Kroening and Karla Stelpflug is GRANTED as to plaintiff Christopher Scarver's claims that they violated his rights under the Eighth Amendment by denying him adequate mental health care and subjecting him to conditions of extreme sensory deprivation and social isolation. The clerk of court is directed to enter judgment for defendants and close this case.